Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

----------------------------------------x

MINKA LIGHTING, INC.,

               Plaintiff,

  -against-

BATH KITCHEN DECOR, LLC d/b/a EAGLES LIGHTING
LLC, LARRY KRAZYMAN, Individually, and DAVID
TROPPER, Individually,

               Defendants,

Index No.:  5:13-cv-02370-RGK-MRW

----------------------------------------x


               452 Fifth Avenue
               New York, New York

               December 4, 2014
               9:20 a.m.


      Deposition of DAVID TROPPER,

pursuant to Notice, before Sophie Nolan, a

Notary Public of the State of New York.

ORAL DEPOSITION OF DAVID TROPPER

Page 2

```
1    A P P E A R A N C E S :
2
3    BAKER & McKENZIE, LLP
4    Attorneys for Plaintiff
5         700 Louisiana, Suite 3000
6         Houston, Texas  77002-2755
7    BY:   MYALL S. HAWKINS, ESQ.
8         PHONE   713-427-5020
9         FAX     713-427-5099
10        E-MAIL myall.hawkins@bakermckenzie.com
11
12   LAW OFFICES OF ALAN J. SASSON, P.C.
13   Attorneys for Defendants
14        1669 East 12th Street, 2nd Floor
15        Brooklyn, New York  11229
16   BY:   YITZCHAK ZELMAN, ESQ.
17        PHONE   718-339-0856
18        FAX     347-244-7178
19        E-MAIL  yzelman@sassonlaw.com
20
21
22
23
24
25
```

Page 4

```
1    ---------- E X H I B I T S (Cont'd) -----------
2    EXHIBIT        DESCRIPTION          FOR I.D.
3    Exhibit 19    Document Bates stamped      76
4         BKD006002 through 6006
5    Exhibit 20    Document Bates stamped      78
6         BKD006060 through 6065
7    Exhibit 21    Document Bates stamped      86
8         BKD006568 through 6571
9    Exhibit 22    Document Bates stamped      87
10        BKD006595
11   Exhibit 23    Copy of 2011 tax return     90
12   Exhibit 24    Copy of 2012 tax return     91
13   Exhibit 25    Copy of 2013 tax return     92
14
15
16        (EXHIBITS TO BE PRODUCED)
17
18
19
20
21
22
23
24
25
```

Page 3

```
1    ----------------- I N D E X -----------------
2    WITNESS         EXAMINATION BY        PAGE
3    DAVID TROPPER    MR. HAWKINS          5, 98
4              MR. ZELMAN          96
5
6
7    ----- DOCUMENTS AND/OR INFORMATION REQUESTED -----
8    PAGE   75  Responsive e-mails to Mr. Krayzman
9
10
11   --------------- E X H I B I T S ---------------
12   EXHIBIT        DESCRIPTION          FOR I.D.
13   Exhibit 12    Deposition notice           6
14   Exhibit 13    Document Bates stamped      61
15        BKD005851
16   Exhibit 14    Document Bates stamped      63
17        BKD005865
18   Exhibit 15    Document Bates stamped      70
19        BKD005875
20   Exhibit 16    Document Bates stamped      70
21        BKD005867 through 5868
22   Exhibit 17    Document Bates stamped      71
23        BKD005897
24   Exhibit 18    Document Bates stamped      75
25        BKD005978
```

Page 5

```
1         D A V I D   T R O P P E R, called as a witness,
2         having been first duly sworn, was
3         examined and testified as follows:
4    EXAMINATION BY
5    MR. HAWKINS:
6         Q.   Mr. Tropper, would you state your
7    full name for the record, please?
8         A.   David Tropper.
9         Q.   Let me introduce myself.  My name
10   is Myall Hawkins.  You and I have talked quite
11   a few times on the telephone but have not had a
12   chance to meet?
13        A.   Correct.
14        Q.   You're here to give a deposition in
15   the Minka Lighting versus BKD, Tropper and
16   Krayzman case?
17        A.   Yes.
18        Q.   Have you ever given a deposition
19   before?
20        A.   A very long time ago.
21        Q.   Can you tell me what circumstances
22   it was?
23        A.   I was a lifeguard in a camp and
24   there was a diving accident.
25        Q.   The same rules generally apply.
```

ORAL DEPOSITION OF DAVID TROPPER

Page 6

1 I'll be asking you questions during today and
2 the court reporter will be taking down every
3 question that I give and every answer that you
4 give. All right?
5      A.   Okay.
6      Q.   They can't take down nods of the
7 head. So what I'd like you to do if you
8 possibly can is say yes or no. If you don't
9 understand one of my questions, please stop me
10 and I'll try to rephrase it.
11           You're not a prisoner here. Any
12 time you want to take a bathroom break or speak
13 to counsel, please advise me and we can take a
14 short break.
15      A.   Okay.
16           (Exhibit 12, deposition notice,
17           marked for Identification.)
18      Q.   Mr. Tropper, you're here pursuant
19 to a notice of deposition today; correct?
20      A.   Okay.
21      Q.   I'm asking you. You understand
22 we're here to take your deposition?
23      A.   Yes.
24      Q.   Exhibit 12 is a notice that was
25 previously provided to your counsel.

Page 7

1      A.   Okay.
2      Q.   Mr. Tropper, can you tell me what
3 your home address is, please?
4      A.   8425 Abingdon Road.
5      Q.   What city would that be in?
6      A.   Kew Gardens, 11415.
7      Q.   Can you tell me your current
8 occupation, Mr. Tropper?
9      A.   I am right now -- I guess you would
10 call it self-employed.
11      Q.   How are you self-employed?
12      A.   I'm trying to work on some business
13 and see what I can salvage from Bath Kitchen
14 Decor.
15      Q.   What kind of businesses are you
16 involved in?
17      A.   Basically trying to sell whatever
18 inventory is left over from Bath Kitchen Decor.
19      Q.   Do you also have a side business
20 with fire alarms?
21      A.   I'm involved in a smoke detector
22 business.
23      Q.   Do you install or sell or test or
24 what are you doing?
25      A.   It's a new product that I'm trying

Page 8

1 to figure out how to sell.
2      Q.   But currently, though, prior to
3 that you don't have, like, a separate fire
4 alarm business?
5      A.   No, what I just described.
6      Q.   You have a product that you want to
7 market?
8      A.   Right.
9      Q.   But right now it's not being sold?
10      A.   There were some sales, but right
11 now there's not any sales going on.
12      Q.   I understand you have a patent for
13 that?
14      A.   I did get a patent, yeah.
15      Q.   Can you tell me your educational
16 background, please?
17      A.   College of knowledge. I just went
18 to a Yeshiva High School and post high school
19 Yeshiva.
20      Q.   And you have a college degree?
21      A.   No.
22      Q.   What courses were you taking in
23 college?
24      A.   I didn't go -- I went for, like,
25 one semester of college.

Page 9

1      Q.   I thought you had rabbinical
2 training?
3      A.   Yes. I said I went to post high
4 school Yeshiva.
5      Q.   For how long did you go to Yeshiva?
6      A.   Four years.
7      Q.   Isn't there some type of degree or
8 something that comes out when you come out?
9      A.   You could get one, it could be that
10 I qualified, but it's not like a Bachelor's or
11 anything.
12      Q.   But you finished your studies at
13 the Yeshiva?
14      A.   Yes.
15      Q.   And are you considered a lay
16 minister or a minister?
17      A.   I can probably call myself a rabbi,
18 but I'm not a practicing one or anything like
19 that.
20      Q.   You've never had a synagogue
21 yourself?
22      A.   No.
23      Q.   As I understand that is the
24 connection between yourself and Mr. Krayzman is
25 that you were actually part of his rabbinical

3 (Pages 6 to 9)

ORAL DEPOSITION OF DAVID TROPPER

**Page 10**

1 studies when he was in high school?
2  A.  Correct.  I was his teacher in high
3 school.
4  Q.  And was that as an adjunct
5 professor or were you actually employed by the
6 high school?
7  A.  At that time I was employed by the
8 high school.
9  Q.  And do you have, like, a teaching
10 certificate in New York?
11  A.  No.
12  Q.  Don't you have to to teach
13 rabbinical studies?
14  A.  No.  You only have to to teach
15 secular studies.
16  Q.  Mr. Tropper, have you utilized
17 various e-mails as part of the business with
18 Bath Kitchen Decor?
19  A.  Yes, of course.
20  Q.  Are one of those
21 DavidTropper@gmail.com?
22  A.  I probably used that e-mail
23 address.  I don't know if it was primarily used
24 for that.  I can't say that it was never ever
25 used to communicate with anyone.

**Page 11**

1  Q.  And is the spelling of your first
2 name as David or Dovid?
3  A.  My legal name is D-A-V-I-D and my
4 Hebrew name is with an O, D-O-V-I-D.
5  Q.  Can you tell me what e-mail is
6 utilized for BKDbooks@gmail.com?
7  A.  I don't understand your question.
8  Q.  Have you ever heard of an e-mail
9 referenced as BKDbooks@gmail.com?
10  A.  I think it was used by people who
11 are using -- taking orders or doing accounting,
12 something like that.
13  Q.  Do you know who those people are?
14  A.  I don't remember offhand.
15  Q.  My understanding is that part of
16 your involvement with BKD was on the investment
17 side?
18  A.  Is that a yes or no question?
19  Q.  Yes.
20  A.  Yes.
21  Q.  What was your initial capital
22 contribution to BKD?
23  A.  The initial contribution was not
24 capital.  It was helping Larry set up bank
25 accounts and credit card processing.

**Page 12**

1  Q.  And how did you learn that
2 yourself?
3  A.  Larry came to me and asked me for
4 help.  I said I would help him and I went on
5 the internet and figured it out.
6  Q.  Had you had previous experience in
7 getting credit card accounts or merchant
8 accounts?
9  A.  I've had personal credit cards, but
10 not credit card processing or merchant
11 accounts.
12  Q.  As far as BKD was concerned, who
13 were those credit card accounts set up with or
14 established with?
15  A.  At the beginning it was with Intuit
16 and there were some subsequent ones, but I
17 don't remember the names offhand.
18  Q.  At any point in time did you assist
19 a third party with that as far as, like, a
20 broker or any other business person to help
21 establish credit lines or a credit card
22 relationship?
23  A.  Did -- I'm not sure what you're
24 asking.  Did I assist a third person?
25  Q.  Did you contact a third person and

**Page 13**

1 get some assistance in trying to set up, you
2 know, a credit card account, a merchant
3 account?
4  A.  Yes, that's usually how the
5 industry works.  You contact people who have
6 relationships with banks and they try to place
7 you with different banks that would set it up.
8  Q.  And then who was the broker that
9 you utilized?
10  A.  We used -- at one point we used a
11 company -- I'm going to try to remember their
12 name.  Give me a minute or two -- Fidelity.
13  Q.  And had you had any prior
14 relationship with Fidelity prior to utilizing
15 them for BKD?
16  A.  Not that I remember.
17  Q.  Prior to your assistance with BKD,
18 had you ever been an organizer of a
19 corporation?
20  A.  I know I've been an organizer of
21 other corporations.  I don't remember the time
22 frame, if it was before or after I started that
23 one.
24  Q.  The Yeshiva that you attended, was
25 that right after high school?

ORAL DEPOSITION OF DAVID TROPPER

Page 14

1    A.  Yeah, yes.
2    Q.  So from 18 to 22?
3    A.  Probably like 17 to 20 -- 21,
4  something like that.
5    Q.  The normal time you would spend at
6  college you attended Yeshiva?
7    A.  Exactly.
8    Q.  Can you give us your work history
9  between the time you left the Yeshiva to the
10  time that Mr. Krayzman approached you?
11   A.  I was teaching for ten or eleven
12  years at that high school where he was.  I
13  worked at a company called Chefs Diet.
14   Q.  What were your responsibilities at
15  Chefs Diet?
16   A.  Chefs diet was a fresh food
17  delivery service and I was hired to help
18  develop a kosher fresh food diet delivery
19  service.
20   Q.  And were you doing that while you
21  were teaching?
22   A.  It overlapped a little bit, so for
23  maybe the first year or so, yes, and then at
24  the end I wasn't teaching anymore.
25   Q.  When was the last time you were

Page 15

1  actually a teacher?
2    A.  I don't remember the date offhand.
3    Q.  I mean, back in --
4    A.  Probably seven or eight years ago.
5    Q.  Approximately 2006, 2007, around?
6    A.  I started in 1996 and I did it for
7  around ten or eleven years, so --
8    Q.  2007 to 2008?
9    A.  Yes.
10   Q.  Other than being a rabbinical
11  teacher or working at Chefs Diet, have you had
12  any other employment other than working with
13  Larry?
14   A.  I worked at a company called Star
15  Financial.
16   Q.  What did Star Financial do?
17   A.  They do, like, investments and
18  insurance, private stuff.
19   Q.  How long did you do that?
20   A.  A year or two, I think.
21   Q.  What were your job
22  responsibilities?
23   A.  To try to source investment
24  opportunities.
25   Q.  What type of investments would you

Page 16

1  be doing?
2    A.  Private, early stage companies.
3    Q.  Did you have any training with Star
4  Financial?
5    A.  No.
6    Q.  During the time that you were with
7  Star Financial did you obtain any kind of
8  certifications or licenses?
9    A.  Nope.
10   Q.  During the time you were associated
11  with BKD did you ever procure any loan for BKD?
12   A.  Yes.
13   Q.  When was that procured?
14   A.  I don't remember the dates, but
15  over the years a few times.
16   Q.  Short-term loans?
17   A.  Yeah, based on credit card
18  receivables.
19   Q.  It's not a factoring company, is
20  it?
21   A.  Is what a factoring company?
22   Q.  Is one a factoring company or did
23  you get a straight-up loan from a bank?
24   A.  No, it's hedge funders who lend
25  based on credit card charges.

Page 17

1    Q.  And would you procure a loan and
2  pay the loan off and get another loan or was it
3  an open credit line?
4    A.  No, it wasn't an open credit line.
5    Q.  So do you think you did it at least
6  twice?
7    A.  Yeah.
8    Q.  And was it with the same
9  institution?
10   A.  At least two different institutions
11  that I can remember.
12   Q.  Which ones were those?
13   A.  One was American Express and I
14  don't remember the name offhand of the other
15  one.
16   Q.  And did you open up the credit line
17  through BKD or through David Tropper
18  individually?
19   A.  Through BKD.
20   Q.  Did you David Tropper have to sign
21  the credit line as an individual guarantor?
22   A.  I don't remember what the paperwork
23  said.
24   Q.  Have you or BKD retained the
25  paperwork?

5 (Pages 14 to 17)

ORAL DEPOSITION OF DAVID TROPPER

Page 18

1    A.   I would have -- I don't know the
2  answer to that.
3    Q.   To your knowledge at the time that
4  you were assisting BKD with some financial
5  assistance, did Mr. Krayzman to your knowledge
6  have any financial capability at all to run the
7  business?
8    A.   I have no idea.
9    Q.   What would Mr. Krayzman tell you
10  what he needed as far as finances?
11    A.   I'm not understanding your
12  question.
13    Q.   How was it that you determined you
14  needed to go to American Express?
15    A.   If they would tell me that they
16  were short a cash.
17    Q.   And did you ever during the time
18  that you were associated with BKD write a
19  personal checks to cover shortfalls in cash?
20    A.   I don't remember writing a personal
21  check to them. I don't remember 100 percent.
22    Q.   Were there any times that you
23  covered any shortfalls personally by BKD?
24    A.   It's possible -- it's possible that
25  I did.

Page 19

1    Q.   How would you go about checking if
2  that was the case?
3    A.   I don't know. I'd have to go back
4  to, I guess, some of my banking records, but
5  I'm almost sure I never wrote a personal check.
6    Q.   Were there any tax deductions that
7  you took individually for your investments in
8  BKD?
9    A.   No.
10    Q.   Is there anything you do as far as
11  your home where you take off any type of a tax
12  credit for you utilizing part of your home for
13  BKD?
14    A.   No, no.
15    Q.   Do you know what I'm talking about?
16    A.   Yeah, if you allocated office
17  expense on your tax returns?
18    Q.   Correct.
19    A.   No, nothing.
20    Q.   Is there currently any type of
21  credit line that's still open for BKD?
22    A.   Well, it's not a credit line.
23  There's a loan that was used, but it's not open
24  in the sense that there's no money available on
25  it.

Page 20

1    Q.   How much was the credit line for?
2    A.   I think, if I remember correctly,
3  around 140,000.
4    Q.   And is that credit line --
5  currently it's been exhausted, where there's
6  140,000 that's been borrowed?
7    A.   Yes.
8    Q.   Is $140,000 still owed?
9    A.   Almost all of it.
10    Q.   Is this from American Express?
11    A.   No, that's from the one that I said
12  I couldn't remember the name.
13    Q.   Has there been any actions taken by
14  that financial institution against you or BKD?
15    A.   Not that I'm aware of.
16    Q.   And you know what I'm talking
17  about, where they would basically file a
18  lawsuit or send a demand letter?
19    A.   No, not that I'm aware of.
20    Q.   Is BKD currently in default of that
21  credit line or that loan?
22    A.   Yes.
23    Q.   When is the last time they paid any
24  money on it?
25    A.   I don't remember offhand.

Page 21

1    Q.   Who would be the individual or
2  individuals responsible for paying that loan?
3    A.   The way that it was set up is that
4  they would withdraw automatically from the bank
5  account.
6    Q.   And do you have any idea when was
7  the last time they were able to successfully
8  withdraw any money?
9    A.   I don't remember, no.
10    Q.   Would it have been in 2013 or 2014?
11    A.   Definitely 2014.
12    Q.   Where would the records be kept for
13  these -- the loan?
14    A.   Just the bank account statements.
15    Q.   And where would those be kept?
16    A.   Where would they be?
17    Q.   Yes.
18    A.   I would have to get copies from the
19  bank.
20    Q.   Was there any records that are
21  either sent electronically or in hard copy to
22  BKD?
23    A.   From who?
24    Q.   From this institutions -- financial
25  institutions that says here we debited your

6  (Pages 18 to 21)

ORAL DEPOSITION OF DAVID TROPPER

Page 22

1    account so many dollars?
2         A.   No.
3         Q.   How does BKD keep track of what
4    would be withdrawn on a monthly basis?
5         A.   It's withdrawn on a daily basis and
6    then it's sort of -- the way it was set up is
7    that there would be a draw based on a
8    percentage of money that came into your bank.
9         Q.   Would there be any type of e-mail
10   notification or anything that would tell you
11   that they had taken out X dollars a day from
12   your account?
13        A.   From this company, no.  From
14   American Express, they sent statements.
15        Q.   How would you know at any point in
16   time for a given day, a given week, how much
17   money had been taken out by this other company?
18        A.   You would see a withdrawal on your
19   bank account.
20        Q.   Would you have to go electronically
21   into your bank account?
22        A.   You would log in to your account
23   and see it.
24        Q.   And where was that particular bank
25   account?

Page 23

1         A.   Which bank?
2         Q.   Yes.
3         A.   TD Bank.
4         Q.   And does TD stand for something
5    else, is that the initials, TD Bank?
6         A.   I don't know.
7         Q.   I'm just saying.
8         A.   It's a big bank.  Maybe on the east
9    coast they're a big bank.  I'm sure it stands
10   for something.
11        Q.   Did you have a particular banker
12   that you would speak with?
13        A.   No.
14        Q.   Originally, are you the individual
15   who helped set up that account?
16        A.   Yes.
17        Q.   Did Mr. Krayzman assist in any
18   manner?
19        A.   No.
20        Q.   Did you have to provide a personal
21   financial statement to the bank?
22        A.   Nope.
23        Q.   And as you sit here today, are you
24   stating on the record that you're not sure if
25   you're a personal guarantor of that loan or you

Page 24

1    know for a fact that you're not a personal
2    guarantor?
3         A.   I'm stating I don't remember the
4    details of the paperwork so if they asked me to
5    sign personally, I did.  If they didn't, I just
6    don't remember.
7         Q.   And do you believe those records
8    still exist, you just don't know where they
9    are?
10        A.   I really don't know.
11        Q.   Let me just make sure I'm correct,
12   there's currently money owed in American
13   Express and this particular financial
14   institution?
15        A.   Yes.
16        Q.   So how much is owed to which?
17        A.   About 140 is to this and I'm not
18   sure of the amount that's owed to American
19   Express.
20        Q.   And would American Express also do
21   an automatic withdrawal?
22        A.   No.  They just would hold the money
23   that you are supposed to get from their
24   charging department.  So if you're supposed to
25   get, for example, $10 they would only give you

Page 25

1    $9.
2         Q.   And do you know what the particular
3    percentage was that they would utilize that
4    there was a certain 25 percent -- that would be
5    coming in that they would automatically deduct?
6         A.   I know there was a number, but I
7    don't remember offhand what it was.
8         Q.   Do you recall getting either a
9    demand letter or a notice from American Express
10   for being in default?
11        A.   No.
12        Q.   Would it be true for both the
13   financial institution and American Express that
14   BKD is currently in default?
15        A.   Probably.
16        Q.   What was your role in making sure
17   that there were timely payments made to either
18   the financial institution or American Express?
19        A.   Well, like I said, American Express
20   just would take your money before they would
21   take what was owed to them before they gave you
22   anything and the other company was doing
23   automatic withdrawals.
24        Q.   Would you be the person that would
25   be monitoring the debits?

7 (Pages 22 to 25)

ORAL DEPOSITION OF DAVID TROPPER

Page 26

1    A.   No.
2    Q.   Who would be?
3    A.   Hopefully Larry.
4    Q.   When you opened these particular
5  accounts either with American Express or with
6  this financial institution, did you do it in
7  person or on the telephone or through the
8  internet?
9    A.   Not a combination of phone and
10  e-mail -- I guess phone.  American Express --
11  actually, was electronic, I believe.
12    Q.   And were you the sole person that
13  took care of those activities with American
14  Express and the financial institution to set up
15  those accounts?
16    A.   Yes.
17    Q.   Would it be fair to say that Larry
18  is not what you'd call a sophisticated person
19  when it comes to business?
20    A.   I guess it depends on whose
21  opinion.
22    Q.   I'm asking yourself, so.
23    A.   He was very good at what he does.
24    Q.   But would that include the
25  financial part of a business?

Page 27

1    A.   No.
2    Q.   Is there a particular bookkeeper
3  that's associated with BKD?
4    A.   No.
5    Q.   And were you aware that BKD did not
6  file any tax returns?
7    A.   Yeah.
8    Q.   When did you know that?
9    A.   I don't remember the exact date.
10    Q.   Was that something that you learned
11  through this litigation or did you know that
12  for a period of years?
13    A.   I knew it before the litigation,
14  but I don't know how long.
15    Q.   Do you know whether Eagles Lighting
16  has ever filed a tax return?
17    A.   I don't believe Eagles Lighting was
18  ever an entity.  I think it was just a name on
19  a website.  I don't think they were -- I'm not
20  100 percent sure.  I could be wrong, but I
21  don't think it was ever a legal entity.
22    Q.   What about Designers Supply House,
23  was that an LLC or --
24    A.   It's an LLC, yeah.
25    Q.   To your knowledge was there ever a

Page 28

1  tax return filed for them?
2    A.   Yes, there was.
3    Q.   Do you know if there was a tax
4  return filed --
5    A.   I'm sorry, could you -- which
6  entity?
7    Q.   Designers Supply House.
8    A.   Okay.  So I thought you were -- I
9  don't know.  I have to recall on Designers
10  Supplies if there ever was a tax return.  I
11  believe it was -- I believe it was a legal
12  entity.  I'm not 100 percent sure.
13    Q.   Have you, yourself, reviewed or
14  signed tax returns for BKD, for Eagles Lighting
15  or for Designers Supply House?
16    A.   For sure not Eagles Lighting.  And
17  I don't recall for Bath Kitchen Decor and
18  Designers Supply House, it's possible that I
19  did.  I would have to go back and look.
20    Q.   Would there be a tax return that
21  you, yourself, would have prepared the
22  information or would that have been given to a
23  tax professional?
24    A.   If it was done, I gave the numbers
25  to an accountant to do the return.

Page 29

1    Q.   Is there a particular accountant
2  that you would utilize for that?
3    A.   Yeah.
4    Q.   Who would that be?
5    A.   Gregory Binkowits.
6    Q.   Can you help me with his last name,
7  please?
8    A.   B-I-N-K-O-W-I-T-S.
9    Q.   And is Mr. Binkowitz in New York
10  City?
11    A.   Yeah.
12    Q.   Do you know what street or town?
13    A.   He's not in Manhattan.  He's in
14  Queens.
15    Q.   Is he associated with a CPA firm or
16  a bookkeeper firm?
17    A.   I don't think so.
18    Q.   Is he solely?
19    A.   I think so.
20    Q.   And you utilized him for a period
21  of years?
22    A.   Yes.
23    Q.   Is a family member at all?
24    A.   Not that I know of.
25    Q.   You may be related, but it's way

8  (Pages 26 to 29)

ORAL DEPOSITION OF DAVID TROPPER

Page 30

1    back?
2        A.   I hope not.
3        Q.   I'm going to hand you what's been
4    previously marked and this was at
5    Mr. Krayzman's deposition as Exhibit Number 2.
6    And do you see that it is the articles of
7    incorporation for Bath Kitchen Decor?
8        A.   Yes.
9        Q.   And is that your signature on the
10   left-hand side?
11       A.   Yes, it is.
12       Q.   And can you tell us why you were
13   the organizer for BKD with the State of New
14   York?
15       A.   Why I was the organizer?
16       Q.   Yes.
17       A.   Like I said, I was trying to help
18   Larry get a business off the ground.
19       Q.   What was the decision, to create an
20   LLC as opposed to Larry running a business as a
21   DBA?
22       A.   There was no -- I really have no
23   recollection of what the thought process was at
24   that time.
25       Q.   Do you know what an LLC is?

Page 31

1        A.   A limited liability company.
2        Q.   Correct.  Do you know why there was
3    an LLC created for Bath Kitchen Decor?
4        A.   Do I know why?  To start an entity,
5    to form an entity.
6        Q.   Was it required by the various
7    companies that worked with Mr. Krayzman or the
8    lending institutions that there had to be an
9    LLC?
10       A.   I wouldn't have an answer to the --
11   what's it called, to the organizations that
12   Mr. Krayzman worked with and this was set up
13   before any lending was done, so --
14       Q.   The -- if you turn, please, to page
15   two of Exhibit Number 2, is there a stamped
16   date on page two of Exhibit 2?
17       A.   Here we go.
18       Q.   Is there a stamped date?
19       A.   August 1, 2010.
20       Q.   And is it your understanding that
21   BKD was already operating in 2009?
22       A.   Yes, it was.
23       Q.   What was your role with BKD prior
24   to its incorporation in August of 2010?
25       A.   My role was -- again, I don't

Page 32

1    remember the exact dates when I started helping
2    him and the role was basically just to get bank
3    accounts and credit card processing.
4        Q.   Okay.  And were you doing that in
5    the spring of 2010?
6        A.   Probably.
7        Q.   I'm going to hand to you what's
8    been marked as Exhibit Number 3 to your
9    deposition, Mr. Tropper.  This is another
10   document that we obtained from the New York
11   Secretary of State.
12           Is there any stock that was issued
13   to you from Bath Kitchen Decor?
14       A.   No.
15       Q.   Do you know if there's any stock in
16   existence?
17       A.   No.
18       Q.   Are you certain right now whether
19   or not anything was filed with the Secretary of
20   State for either Designers Supply House or
21   Eagles Lighting?
22       A.   I'm almost 100 percent sure Eagles
23   Lighting, no.  I can't say 100 percent and
24   Designers Supply House it's possible that it
25   was.  I would have to go back and check.

Page 33

1        Q.   In Exhibit Number 2 there's an
2    address that's reflected as 185-12 Union
3    Turnpike.  What does that address belong to?
4        A.   I used to work out of there.
5        Q.   And by that you're talking about
6    what BKD did?
7        A.   Yeah, at the beginning.
8        Q.   How long was BKD at the union
9    Turnpike address?
10       A.   I don't remember exactly.
11       Q.   Do you know whether or not since
12   August of 2010 when the articles of
13   incorporation were filed with the Secretary of
14   State and to the present, whether or not the
15   address as reflected in articles of
16   incorporation were changed?
17       A.   I don't believe they were.
18       Q.   Where is BKD currently operating?
19       A.   To the extent that there are
20   operations, 2917 Avenue J, Brooklyn New York.
21       Q.   Can you tell me the reasons for
22   moving from the Union Turnpike address to the
23   other address?
24       A.   Larry is in Brooklyn so it's more
25   convenient for him.

9 (Pages 30 to 33)

ORAL DEPOSITION OF DAVID TROPPER

Page 34

1      Q.   Prior to Mr. Krayzman approaching
2 you and asking you for assistance, had you ever
3 been in the retail business selling either
4 ceiling fans or lights?
5      A.   Nope.
6      Q.   And had you kept in contact with
7 Mr. Krayzman over the years since when he was a
8 student up to the time he contacted you?
9      A.   I'm sure there was some contact on
10 and off, but nothing of great substance.
11      Q.   Mr. Krayzman didn't attend the same
12 synagogue that you did?
13      A.   I don't think Mr. Krayzman attends
14 synagogue.
15      Q.   He's not part of a club or other
16 organization that you would run into him on a
17 regular basis?
18      A.   Certainly not.
19      Q.   And I think you've testified before
20 that there's no type of familial relationship
21 with him; he's not a cousin, a distant cousin?
22      A.   Mr. Krayzman?
23      Q.   Yes.
24      A.   He's definitely not. I don't
25 recall testifying to that.

Page 35

1      Q.   I just want to be sure there's no
2 familial relationship.
3      A.   As far as I know, we have no blood
4 relatives, distant, very distant.
5      Q.   Other than Mr. Krayzman and
6 yourself, was there anyone else that was
7 involved in the management of BKD?
8      A.   Mr. Krayzman was the only one
9 involved in the management.
10      Q.   Certainly you assisted in getting
11 BKD incorporated; correct?
12      A.   Correct.
13      Q.   You assisted BKD in getting
14 financing; correct?
15      A.   Correct.
16      Q.   Other than yourself and
17 Mr. Krayzman was there anybody else that, to
18 your knowledge, that made any type of business
19 decisions --
20      A.   No, there wasn't any.
21      Q.   Mr. Tropper, let me hand to you
22 what's been marked as Exhibit Number 8. And I
23 ask you, are you familiar with the lawsuit that
24 was briefly brought by a manufacturer by the
25 name of Quoizel?

Page 36

1      A.   Yes, I am.
2      Q.   And were you a party to a consent
3 decree enter by Quoizel against Bath Kitchen
4 Decor, David Tropper and Larry Krayzman?
5      A.   Yes, I was.
6      Q.   And was that particular consent
7 judgment filed in 2012?
8      A.   That's what it says on here, yes.
9      Q.   Can you tell us, please, what the
10 nature of that lawsuit was by Quoizel against
11 Bath Kitchen Decor, Krayzman and Tropper?
12      A.   Sure. They wanted the Bath Kitchen
13 Decor not to sell products below MAP.
14      Q.   And for the ladies and gentlemen of
15 the jury, can you tell us what MAP means?
16      A.   MAP is a term that's referred to
17 the price that the manufacturer sets that
18 resellers could sell it for.
19      Q.   Have you ever heard of an acronym
20 called UMRP?
21      A.   No.
22      Q.   Uniform Minimum Resale Price?
23      A.   Never heard of that.
24      Q.   Prior to Quoizel suing BKD,
25 Krayzman and Tropper, did you receive any type

Page 37

1 of demand or notice letters?
2      A.   From Quoizel?
3      Q.   Yes.
4      A.   I don't remember.
5      Q.   Did you have assistance of counsel
6 in that particular case?
7      A.   No, I didn't.
8      Q.   And as far as chronologically, was
9 this particular consent decree approximately
10 one year before Minka filed its lawsuit in this
11 case?
12      A.   If I knew the date that Minka filed
13 their case, I would be able to say.
14      Q.   I'll represent to you that the
15 lawsuit by Minka was filed in December 2013?
16      A.   Okay.
17      Q.   Would it be fair to say that
18 whatever date that lawsuit was filed by Minka,
19 it was after the Quoizel lawsuit?
20      A.   Based on the dates here, this was
21 filed at the end of 2012.
22      Q.   Right. So is it your understanding
23 that whatever date it was for the Minka
24 lawsuit, it was after the Quoizel lawsuit was
25 filed?

10 (Pages 34 to 37)

ORAL DEPOSITION OF DAVID TROPPER

Page 38

1     A.   Yes.
2     Q.   And let me hand to you,
3  Mr. Tropper, what's been marked as Exhibit 6.
4  What I'm referring to are deposition exhibits
5  previously marked that was marked at
6  Mr. Krayzman's deposition.  Are you familiar
7  with a lawsuit that was brought by Quorum
8  against Bath Kitchen Decor and yourself?
9     A.   Yes.
10    Q.   And was there a consent decree
11 entered as reflected in Exhibit Number 6?
12    A.   Yes.
13    Q.   And was that consent decree filed
14 with the Northern District of Texas
15 approximately April 30th of 2013?
16    A.   Yes.
17    Q.   And, Mr. Tropper, did the Quorum
18 lawsuit, did that predated the Minka lawsuit?
19    A.   Again, I don't know the exact date
20 of the Minka lawsuit.
21    Q.   Do you recall a Minka lawsuit being
22 filed prior to the Quoizel or Quorum lawsuit?
23    A.   To the best of my recollection, the
24 Quorum was before Minka.  I can't say for sure,
25 but that's my recollection.

Page 39

1     Q.   Mr. Tropper, if you look at Exhibit
2  Number 6, page three, is your signature on the
3  third page?
4     A.   Yes, it is.
5     Q.   At any time did David Tropper file
6  any type of pleading with either the Quorum or
7  Quoizel courts and notify the court or opposing
8  counsel that you did not have any
9  responsibility whatsoever for BKD's activities?
10    A.   I don't recall filing anything with
11 the courts.
12    Q.   Did you have a counsel at all for
13 either the Quorum or the Quoizel cases?
14    A.   No, I did not.
15    Q.   Did you agree to be bound to the
16 consent decrees entered against you in the
17 Quorum or Quoizel cases as reflected in the two
18 exhibits we just talked about?
19    A.   I agreed to whatever I signed in
20 this paper.
21    Q.   You agreed to be bound by that;
22 correct?
23    A.   Yup.
24    Q.   Can you tell that me after the
25 consent decrees were entered in the Quorum or

Page 40

1  Quoizel case, were there any changes in the
2  business activities of BKD at that time
3  following the entering of these consent
4  decrees?
5     A.   I know that I told Larry subsequent
6  to these to make sure not to sell any product
7  in a way which companies were telling him not
8  to.
9     Q.   And you understand that Minka was
10 one of those companies that ultimately
11 complained to BKD and filed suit against BKD
12 and you; correct?
13    A.   Yes, I'm aware of that.
14    Q.   What steps did you take to follow
15 up with Larry or what types of checks and
16 balances did you put in place to ensure that
17 BKD would honor the manufacturers' minimum
18 pricing or uniform minimum policies?
19    A.   I, on numerous times, told Larry
20 that he should not sell below MAP or not sell
21 the Minka products.
22    Q.   And do you have any e-mail notices
23 or any kind of registered letters or anything
24 else that would document those communications?
25    A.   Not that I know of, no.

Page 41

1     Q.   Would the communications that
2  you're talking, Mr. Tropper, have been only be
3  oral in nature?
4     A.   Most likely.
5     Q.   At any point in time after the
6  consent decrees were entered in Quorum or
7  Quoizel, did you ever withdraw your
8  participation or advice to BKD?
9     A.   Nope.
10    Q.   At any point in time after the
11 Quorum or Quoizel lawsuit, did you take legal
12 advice pursuant what legal steps BKD may or may
13 not have to do to not run afoul of
14 manufacturers' policies?
15    A.   If you could just state the
16 question part of that sentence.
17    Q.   What I'm trying to find out is is
18 that did you obtain any type of legal advice or
19 consult with an attorney --
20    A.   No.
21    Q.   -- to get -- let me just finish it.
22    A.   Okay.
23    Q.   To get advice to what steps BKD
24 could do to avoid being sued again?
25    A.   Nope.

11 (Pages 38 to 41)

ORAL DEPOSITION OF DAVID TROPPER

Page 42

1    Q.   Would that be none?
2    A.   None.
3    Q.   To your knowledge did Bath Kitchen
4 Decor, Eagles Lighting or Designers Supply
5 House, ever have an agreement, a written
6 agreement with a manufacturer to resell their
7 product?
8    A.   None that I know of, but -- not
9 that I could remember.
10   Q.   And we're not talking about any
11 licensed distributor. Are you familiar with
12 what I'm talking about?
13   A.   I presume that it means that
14 someone has a written agreement with a
15 manufacturer of lighting.
16   Q.   Right. And, to your knowledge, did
17 BKD ever have a written agreement with a
18 manufacturer?
19   A.   I can't say unequivocally that they
20 never had anything with anyone.
21   Q.   Did you ever yourself take steps to
22 enter into a written agreement or at least to
23 solicit a manufacturer to enter into a written
24 agreement?
25   A.   It could be that we tried. I don't

Page 43

1 remember.
2    Q.   During the time that or after being
3 the organizer for Bath Kitchen Decor, did you
4 ever keep any corporate minutes?
5    A.   Never.
6    Q.   Did you ever solicit any advice
7 pertaining to what the duties would be as an
8 organizer of a limited liability corporation
9 pertaining to the business records?
10   A.   Nope.
11   Q.   Does Bath Kitchen Decor pay
12 employment taxes at all?
13   A.   Yeah, anyone who worked for us was
14 paid through a payroll company and they would
15 deduct all the appropriate payroll taxes.
16   Q.   How were you paid from Bath Kitchen
17 Decor?
18   A.   No set -- no set procedures or
19 anything.
20   Q.   I mean, would it be a situation
21 where if there was money in the bank and you
22 thought that you could justify it, you would
23 withdraw money?
24   A.   I guess something like that.
25   Q.   How would you go about the physical

Page 44

1 activity of doing it?
2    A.   It really would depend, either
3 write a check or something like that.
4    Q.   Did you have a debit card for the
5 checking account?
6    A.   Sure.
7    Q.   And did Mr. Krayzman have a debit
8 card for the checking account?
9    A.   I believe he did, yeah.
10   Q.   Could you take -- withdraw money
11 from the BKD checking account through a debit
12 card?
13   A.   Physically?
14   Q.   Yes.
15   A.   I'm sure you could, yeah.
16   Q.   Did you, in fact, do that?
17   A.   I'm sure at some points I did. I
18 don't have an exact recollection of how often,
19 but over the years I'm sure I have.
20   Q.   Is there any accounting that you
21 have pertaining to when you would draw money
22 for personal reasons through a debit card as
23 far as what was being taken out?
24   A.   Most often it would be just like
25 verbal conversations between Larry and myself.

Page 45

1    Q.   It would be, like, Larry, I'm going
2 to take $500 out and you'd say, okay, fine?
3    A.   That would be a good example.
4    Q.   Okay. And would Mr. Krayzman do
5 the same, to your knowledge?
6    A.   Basically. I would say
7 Mr. Krayzman would probably do something
8 similar, yeah.
9    Q.   Did Mr. Krayzman, to your
10 knowledge, did he also utilize a debit card to
11 pay for personal expenses such as rent and food
12 and such?
13   A.   I'm not -- that, I don't know.
14   Q.   Okay. Your only understanding or
15 discussion that would be between you and
16 Mr. Krayzman would be I'm taking money out but
17 there may not be a discussion for what it would
18 be used for?
19   A.   That could be accurate.
20   Q.   Other than looking at the bank
21 statement itself, would there be any way to
22 determine through a separate system books and
23 records to determine what was taken out and
24 when it was taken out?
25   A.   Not that I know of.

ORAL DEPOSITION OF DAVID TROPPER

Page 46

1    Q.   During the zenith or the height of
2  BKD, do you know how many different
3  manufacturers' products were being sold?
4    A.   I have no idea.
5    Q.   Do you know if it was in the dozens
6  or in the hundreds?
7    A.   I would be surprised if it was the
8  hundreds, but really, I don't know.
9    Q.   If I were to tell you that from the
10 records that BKD has produced to date, that the
11 sales of Minka products alone were over $2
12 million?  Would you be surprised to hear that?
13   A.   No, I know that from the recent
14 conversations in California.
15   Q.   Is there any other manufacturer
16 that you're aware of where the sales of their
17 product were in excess of the sales of Minka
18 products?
19   A.   I have no idea.
20   Q.   Do you have any understanding at
21 all whether or not the sales for Minka, if not
22 the largest sales, were certainly in the top
23 five sales for any particular manufacturer?
24   A.   I don't know for sure.  If I had to
25 guess, I would say yes, but --

Page 47

1    Q.   Are there any other -- we talked a
2  little bit this morning first about e-mails and
3  we had DavidTropper@gmail.com and we had do
4  DTropperStar@gmail.com; correct?
5    A.   Correct.
6    Q.   When do you use
7  DTropperStar@gmail.com?
8    A.   It's probable more related to
9  business stuff than personal.
10   Q.   And does the Star have any
11 significance at all?
12   A.   No.
13   Q.   And is the David Tropper more a
14 personal e-mail?
15   A.   Yes.
16   Q.   And the DTropperStar@gmail.com is
17 more of a business e-mail account?
18   A.   I can't say there's no overlap, but
19 yes.
20   Q.   And BKDBooks@gmail.com, you're not
21 familiar with what that e-mail is for?
22   A.   I think I stated I believed it was
23 used to -- for -- to send out, like, invoices
24 or sales, stuff like that.
25   Q.   What would you be copied on

Page 48

1  regarding either purchases -- I'm talking about
2  electronic communications.  What would you be
3  copied on for either purchases of products or
4  sale of product.
5    A.   For purchases of product, I don't
6  believe I was copied at all.  Again, I'm not
7  going to say that over the years I was never
8  CC'd but I -- there was no consistent thing.
9         And at some point I was getting
10 CC'd on orders that were coming in from the
11 website.
12   Q.   Okay.  And was that on a daily
13 basis, a weekly basis?
14   A.   I think the website was set up that
15 when it sent out a sales order confirmation, I
16 would be CC'd.
17   Q.   Would you receive that on a home
18 computer or on a smartphone?
19   A.   I think they were going to the
20 DTropperStar e-mail address.
21   Q.   Is that something you can access
22 through your smartphone or something you can
23 only access through a home computer?
24   A.   It's been a while since I've been
25 getting them, so I don't know.

Page 49

1    Q.   Do you recall how you would
2  typically receive a DTropperStar e-mail?
3    A.   I'd see it on a gmail account.
4    Q.   Would that be something you'd
5  access from your phone or something you'd only
6  be able to access from your home?
7    A.   I'm saying I could access my e-mail
8  account from the phone.
9    Q.   And did you, in fact, do that?
10   A.   Again, I haven't been getting them
11 for a long time, so I can't say that I never
12 did, but I would imagine that if they came in
13 over my e-mail address, I've seen them on my
14 phone.
15   Q.   My understanding is that there's a
16 company that's also called Home Kitchen Decor?
17   A.   Okay.
18   Q.   Am I telling you that for the first
19 time?
20   A.   Yes, you are.
21   Q.   Have you ever heard of a Home
22 Kitchen Decor that would sell returned products
23 to BKD that would sell products to -- to Amazon
24 through a Home Kitchen Decor?
25   A.   I know that there was an

13 (Pages 46 to 49)

ORAL DEPOSITION OF DAVID TROPPER

Page 50

1  arrangement Larry had with someone that was
2  selling items that we had that were returned.
3      Q.   Had you ever met that individual
4  before?
5      A.   Yeah, sure.
6      Q.   Did you know him prior to your
7  business relationship?
8      A.   He's a person who works in a local
9  business next to where we are now at 2917
10 Avenue J.
11     Q.   And he's at 2919 Avenue J; correct?
12     A.   If that's the address, yeah.
13     Q.   Then what's that individual's name?
14     A.   His first name is Haim.
15     Q.   And Haim, as far as for him, what
16 type of business is he in?
17     A.   As far as I know he works in a
18 bakery.
19     Q.   Do you know how he was solicited?
20     A.   I don't know.
21     Q.   We talked regarding the Quorum and
22 Quoizel lawsuit. Let me hand to you what's
23 been marked as Exhibit Number 9 and ask you are
24 you the David Tropper that is named in the
25 Troy - CSR Lighting case currently pending in

Page 51

1  California?
2      A.   Yes.
3      Q.   And have you filed an answer in
4  that case, made an appearance?
5      A.   I believe my attorney is taking
6  care of it.
7      Q.   And while the particular
8  allegations may be somewhat different between
9  the Quorum, the Quoizel and the Troy Lighting
10 case, are they essentially the same allegations
11 that BKD and you and Mr. Krayzman are
12 interfering with the relationship between the
13 manufacturers and their distributors?
14     A.   I believe that the lawsuits were
15 because the manufacturers were trying to
16 enforce their MAP pricing.
17     Q.   It's the minimum pricing policies?
18 Is that a yes?
19     A.   That's a yes.
20     Q.   As far as the pricing of products
21 that are sold from Bath Kitchen Decor, Eagles
22 Lighting or from Designers Supply House, what
23 was the plan or what was the metric that was
24 involved to determine how much would be
25 increased from whatever the purchase price was

Page 52

1  to the sale price?
2      A.   That was something that Harry did.
3      Q.   Did you ever have any discussion
4  pertaining to we're going to buy products for X
5  price and we will add an additional ten or
6  fifteen percent?
7      A.   Again, I can't recollect every
8  single conversation I ever had with him over
9  the years, but I could say that any decision
10 like that was certainly his.
11     Q.   Well, ultimately the decision may
12 be his, but was there a discussion with
13 Mr. Krayzman that what we're going to do is get
14 these products and sell them generally for 10
15 percent over cost, for 15 percent over cost or
16 20 percent over cost?
17     A.   Nothing specifically like that.
18     Q.   Was there any discussion at all
19 regarding pricing of products to the end user?
20     A.   The discussions were to basically,
21 in a general sense, make sure that we weren't
22 losing money at the end of the day on -- on the
23 orders after taking all the expenses into
24 consideration.
25     Q.   Okay.  What expenses would you have

Page 53

1  to take into consideration?
2      A.   Credit card processing, shipping,
3  cost of goods and marketing.
4      Q.   Let me ask you about marketing
5  Mr. Tropper.  What marketing expenses would
6  BKD, Eagles Lighting or Designers Supply House
7  have?
8      A.   Mainly Google and a company called
9  Price Grabber.
10     Q.   And I'm not familiar with how
11 they're -- what you pay for marketing or how is
12 that done.  What kind of expenses would be
13 incurred through Google or Price Grabber?
14     A.   They used the Pay Per Click model,
15 where for every time someone clicks on a link
16 associated with your website, you get charged.
17     Q.   And would you have discussions with
18 Mr. Krayzman pertaining to where BKD was listed
19 by Google as far as if it was on the second
20 page, the first page or higher up?
21     A.   Again, I can't say that over the
22 course of the years we never had any of those
23 conversations, but basically he was taking care
24 of all of the Google marketing.
25     Q.   Did you know what Mr. Krayzman's

ORAL DEPOSITION OF DAVID TROPPER

Page 54

1    experience was for marketing of products?
2        A.   No.
3        Q.   Are you aware of complaints by
4    consumers separate and apart from any
5    manufacturers' complaints but consumers
6    complaining about the services or the products
7    delivered or not delivered by Bath Kitchen
8    Decor, Eagles Lighting or Designers Supply
9    House?
10       A.   Can you rephrase the question?  Are
11   you talking about a specific complaint?
12       Q.   Yes.  Are you familiar that
13   consumers would send complaints in or post
14   complaints on the internet pertaining to Bath
15   Kitchen Decor, Designers Supply House or --
16       A.   Larry definitely told me that we
17   would sometimes get bad reviews.
18       Q.   Were you -- did you participate in
19   the decision to stop selling product through
20   Bath Kitchen Decor and to start selling product
21   through Eagles Lighting?
22       A.   Not that I could remember, no.
23       Q.   Did you participate in any
24   conversation with Larry or BKD to stop selling
25   products in Designers Supply House and start

Page 55

1    selling product --
2        A.   Again, I can't recall every single
3    conversation that I ever had with him so -- but
4    I don't remember specifically -- I don't
5    remember specifically having a different
6    website for that.  We just found that if we had
7    multiple websites, it would result in more
8    increased sales.
9        Q.   Other than the Bath Kitchen Decor,
10   Eagles Lighting and Designers Supply House, are
11   there any other websites that you're familiar
12   with that I have not mentioned here?
13       A.   Could you say the list again.
14       Q.   Bath Kitchen Decor, Eagles
15   Lighting, Designers Supply House?
16       A.   There was one other site that I
17   think was selling under Decor Designs
18   Unlimited.
19       Q.   How do you spell that, sir?
20       A.   D-E-C-O-R, Designs Unlimited.
21       Q.   And do you recall whether Decor
22   Designs Unlimited was incorporated or was a
23   DBA?
24       A.   I don't remember.
25       Q.   Do you recall how long that

Page 56

1    particular website was operating?
2        A.   No.
3        Q.   Do you know if it's still in
4    operation?
5        A.   I don't think it is.  I'm not 100
6    percent sure.
7        Q.   Do you recall whether or not Bath
8    Kitchen Decor, Designers Supply House, Eagles
9    Lighting and Decor Design Unlimited were
10   operating all simultaneously?
11       A.   I think at some point, they were,
12   but not Eagles Lighting though.  Eagles
13   Lighting I think was a very short-lived thing.
14       Q.   Did you discuss with Larry or did
15   Larry discuss with you where BKD was obtaining
16   the images that were utilized on the website?
17       A.   I don't have a recollection of
18   that.
19       Q.   You've heard the term copyrights
20   before?
21       A.   Sure.
22       Q.   And you've heard the term
23   trademarks before?
24       A.   Sure.
25       Q.   Do you know whether or not BKD or

Page 57

1    any of the other entities we just talked about
2    either had any type of copyrights themselves or
3    trademarks?
4        A.   Not to my knowledge.
5        Q.   Did you at any time speak with
6    Mr. Krayzman about the need or necessity to
7    approach the manufacturers to get their
8    permission to utilize any of the registered
9    copyrights or registered trademarks utilized by
10   Bath Kitchen Decor, Designers Supply House,
11   Eagles Lighting or the decor company?
12       A.   I don't recollect any such
13   conversation.
14       Q.   Is it true, though, that through
15   the Quorum and Quoizel lawsuit that you knew as
16   an individual defendant that you could no
17   longer utilize their particular copyrights or
18   trademarks?
19       A.   What I knew from Troy and Quoizel
20   was that they didn't want us to sell at a price
21   below that IMAP and in my conversation with the
22   lawyers in those cases the ideas of trademarks
23   and copyrights were never really, to my
24   knowledge, discussed.
25       Q.   Other than not selling, did BKD or

15 (Pages 54 to 57)

ORAL DEPOSITION OF DAVID TROPPER

Page 58

1   other affiliates ever advertise those products
2   again?
3      A.   After we signed that?
4      Q.   Yes, for Quorum and Quoizel.
5      A.   To the best of my knowledge, never.
6      Q.   So there was more than just the
7   issue of selling product underneath the MAP.
8   There's also issues that those particular
9   manufacturers' products were never advertised
10  again?
11     A.   I'm not understanding the question.
12     Q.   Well, currently one of the issues
13  we have with the Minka lawsuit was that BKD and
14  its affiliates were using the Minka images and
15  the registered trademarks; correct?
16     A.   Correct.
17     Q.   And was that also the case for
18  Quorum and Quoizel, is that during the
19  advertising of the Quorum and Quoizel products,
20  they were also using -- BKD and its affiliates
21  were also utilizing the copyrighted images and
22  the marks?
23     A.   I don't recollect what was in their
24  paperwork, but I do remember that the agreement
25  was that unless we had permission to sell their

Page 59

1   items after, that we wouldn't sell regardless
2   of the price.
3      Q.   Right.  And you would not
4   advertise, correct, you would not show any of
5   their products on your website?
6      A.   To the best of my knowledge, we did
7   not advertise or sell any of their products
8   after.
9      Q.   Did you assist Mr. Krayzman or sign
10  any documentation pertaining to any type of web
11  hoster that was utilized for any of the
12  entities we just talked about?
13     A.   Can you say the question again?
14     Q.   Sure.  Was there a web hoster that
15  was utilized for the benefit of BKD or its
16  affiliates?
17     A.   I believe that it was either done
18  through the -- through the shopping cart that
19  you would select the name and they would
20  hose -- and they hosted the website.
21     Q.   Do you think that was true for the
22  various entities, the BKD and the various
23  affiliates?
24     A.   If you could be specific what it is
25  you're trying --

Page 60

1      Q.   What I'm trying to find out is that
2   certain companies when they advertise, they
3   will actually have a web hoster to enter a
4   relationship with and that internet provider,
5   the web hoster, will be the person that will
6   obtain the hits and advertise the information
7   regarding the different products that they
8   have?
9      A.   If I'm understanding your question
10  correctly, the advertising was done by us, not
11  through any other -- not through the web
12  hosting company.
13     Q.   Was there a dedicated server that
14  you had set up for that, like a computer
15  server?
16     A.   No.  The website was hosted by the
17  shopping cart company.
18     Q.   And there was a fee associated with
19  it?
20     A.   Sure.
21     Q.   Okay.  Were you involved in the
22  negotiation of that contract at all?
23     A.   No.
24     Q.   Do you know whether or not that
25  shopping cart took care of not only BKD, but

Page 61

1   all the affiliated companies we're talking
2   about?
3      A.   To my knowledge it did.
4      MR. ZELMAN:  I'm going to call a
5   short break at 10:30.
6      MR. HAWKINS:  We can do it now.
7      (Recess taken.)
8     Q.   I wanted to talk to you about
9   several e-mails and I'll represent to you that
10  your counsel provided me some e-mails and I'm
11  not going to go through all of these, but I
12  have certain selected ones.
13      (Exhibit 13, document Bates stamped
14  BKD005851, marked for Identification.)
15     Q.   This one is Exhibit Number 13.  I
16  think that's Bates stamped as BKD 5851.
17     A.   Okay.
18     Q.   I'm trying to find out some of the
19  context for that particular e-mail, why you're
20  being CC'd on it pertaining to -- I mean
21  there's a statement that says "This is for all
22  the payments I made" and it's from Larry to
23  yourself.
24     A.   I have no idea why.
25     Q.   Would it be fair to say that during

16 (Pages 58 to 61)

ORAL DEPOSITION OF DAVID TROPPER

Page 62

1   the time that you were working with
2   Mr. Krayzman that you would periodically get
3   e-mails from him advising about money that was
4   coming in and money that was going out?
5        A.   It's safe to say that Larry would
6   CC me on e-mails without any, you know,
7   sometimes without any rhyme or reason, I would
8   not know why I would be getting CC'd on it.
9        Q.   And you see where the e-mail is --
10  or the e-mail address of BKDBooks is there?
11       A.   Yeah, I do see that.
12       Q.   And do you know where that goes or
13  who it goes to?
14       A.   It could be that it was going to
15  someone who was -- you know, maybe trying to do
16  some bookkeeping or something.
17       Q.   To your knowledge was there ever
18  formal bookkeeper for BKD?
19       A.   It could be that for a few weeks or
20  we try to have one or something, but not on an
21  ongoing basis.
22       Q.   What is the date of that e-mail
23  shown --
24       A.   January 25, 2013.
25       Q.   Approximately almost two years ago?

Page 63

1        A.   Yup.
2        Q.   What's the second number on that,
3   please?
4        A.   13.
5        Q.   Have you heard of a retailer by the
6   name of Circle Lighting?
7        A.   I've heard of it, yeah.
8        Q.   How have you heard of them?
9        A.   I think Larry used to buy from
10  them.
11       Q.   Did you also understand that part
12  of what he would buy from Circle Lighting would
13  be Minka products?
14       A.   I don't know what he bought from
15  whom.
16           (Exhibit 14, document Bates stamped
17  BKD005865, marked for Identification.)
18       Q.   Let me hand to you what's marked as
19  Exhibit Number 14.  Is this an e-mail that
20  Mr. Krayzman would have sent to you pertaining
21  to ordering more products from the manufacturer
22  Uttermost?
23       A.   I'm not sure of what your question
24  is.
25       Q.   Is this an e-mail that you're CC'd

Page 64

1   on?
2        A.   Yes.
3        Q.   Is it reflect on the right side BKD
4   5865, the Bates stamp.
5        A.   I'm not sure what you're referring
6   to.
7            MR. ZELMAN:  This.
8        A.   Yes.  It's BKD 005865?
9        Q.   The reason I'm asking you that is
10  that when your counsel produced documents to
11  us, we individually label each document so
12  we're clear on the record.
13           The document you're looking at is
14  BKD 5865; is that correct?
15       A.   Yes.
16       Q.   That is an e-mail you're copied on
17  and is that pertaining to sales or purchases of
18  Uttermost products and e-mail is from Circle
19  Lighting?
20       A.   It says that this is from Larry to
21  Lacey at Circle Lighting.
22       Q.   Have you, yourself, ever met
23  anybody from Circle Lighting?
24       A.   Not to my knowledge.
25       Q.   During the time that you were

Page 65

1   associated with Larry running BKD, Eagles
2   Lighting or the Designers Supply House, did any
3   of the various distributors that you would deal
4   with, did any of those ever come to the 2917
5   Avenue J location?
6        A.   I know that there were some that
7   came, but I don't remember who.
8        Q.   At any point in time, did you ever
9   go on sales calls where Larry would try to
10  approach a new distributor to say we'd like to
11  purchase products from you?
12       A.   On a sales call, no.
13       Q.   Did you, yourself, ever make those
14  calls yourself or participate in a telephone
15  call where BKD -- you'd call for BKD's benefit
16  and say we'd like to purchase product from you?
17       A.   I don't remember doing that.
18       Q.   Did you ever have any calls where
19  you talked at all to any distributors or
20  retailers if they had a concern or had a
21  problem at BKD that you would help field the
22  phone call?
23       A.   Not to my recollection.  I can't
24  say over the years that it never happened, but
25  certainly if it was, it was an exception.

Innovative Legal Solutions, Inc.,713-658-0802,713-658-0704

ORAL DEPOSITION OF DAVID TROPPER

Page 66

1      Q.   Does BKD currently have any
2 employees?
3      A.   I believe that there's one person
4 still.
5      Q.   Who would that be?
6      A.   I don't know her name offhand.
7      Q.   Do you know what she does?
8      A.   I think she's just doing, you know,
9 the -- BKD really isn't really doing any -- is
10 not doing any sales right now. I think it's a
11 few hours a day answering e-mails.
12      Q.   When I previously deposed
13 Mr. Krayzman, he said that BKD really didn't
14 have inventory per se, that if there was
15 inventory, it was returned items; is that true?
16      A.   BKD, as far as I know, never bought
17 inventory in order to sell. The items that we
18 have in our possession, to my knowledge, are
19 returns that came back.
20      Q.   Was there a lease signed for 2917
21 Avenue J?
22      A.   Yes.
23      Q.   Who signed the lease?
24      A.   Probably me.
25      Q.   Do you know if you signed it in

Page 67

1 your individual name or you signed it as a
2 representative of BKD?
3      A.   I don't remember.
4      Q.   And do you recall whether or not
5 you signed it for both capacities; both in a
6 representative capacity and an individual
7 capacity?
8      A.   I don't remember.
9      Q.   Can you tell me what that lease
10 term is for?
11      A.   It's $4,000 a month for two years,
12 maybe two and a half years. I'm not 100
13 percent sure.
14      Q.   And you know when I say a personal
15 guarantee, do you know what that is?
16      A.   I know.
17      Q.   And as far as the lease terms, do
18 you know where -- when that term began and when
19 it ends?
20      A.   I don't know that either, but I
21 know that it's probably at the beginning of its
22 second year maybe, if I had to guess.
23      Q.   Did you negotiate the lease?
24      A.   It wasn't much of a negotiation.
25      Q.   Would you be the person speaking to

Page 68

1 the landlord?
2      A.   Yeah, that would be something I
3 did.
4      Q.   Did you have any previous dealings
5 with this particular landlord?
6      A.   Before the lease?
7      Q.   Yes.
8      A.   No.
9      Q.   How did you determine that 2917
10 Avenue J was a good location?
11      A.   It was across the street from 2918
12 Avenue J where we were previously located.
13      Q.   Was it more space or less space?
14      A.   Yeah, much more space.
15      Q.   Can you tell me when you started
16 with 2918 and when you ended with 2917?
17      A.   I don't remember the dates but
18 probably a year before we started with 2917.
19      Q.   If there's no inventory to be
20 concerned with, why did you need bigger space?
21      A.   For the returns that were coming
22 back.
23      Q.   And how many returns were there at
24 one point in time? What's the largest number
25 of returns that you had?

Page 69

1      A.   I don't know, but also we were able
2 to, with more space, hire more employees.
3      Q.   Who was the person responsible for
4 hiring employees?
5      A.   I would think mostly it was Larry
6 who would give his agreement to hire someone or
7 not.
8      Q.   Do you recall a person that you
9 hired that his side business was a
10 photographer, that he did something for BKD but
11 his was main job was as photographer?
12      A.   I'm not saying you're making an
13 inaccurate statement, but I have no idea what
14 you're talking about.
15      Q.   Right. My understanding, and this
16 is from information we gleaned from the
17 internet, that there was one individual that
18 was critical of his employment status at Bath
19 Kitchen Decor and that he had some occupation
20 or avocation pertaining to photography.
21      A.   I believe I know who you're
22 referring to. I don't know his name offhand.
23 I don't know anything about him being a
24 photographer, but it turned out that he wasn't
25 a -- I want to stay this nicely. He wasn't a

ORAL DEPOSITION OF DAVID TROPPER

Page 70

1 stable person.
2     Q.    But he was let go after some amount
3 of time?
4     A.    A very short amount of time.
5         (Exhibit 15, document Bates stamped
6     BKD005875, marked for Identification.)
7     Q.    Let me hand you what's been marked
8 as Exhibit Number 15 and it's Bates stamped BKD
9 5875 and I'd ask you to concentrate on the top
10 part of the e-mail and do you see where he
11 mentions an "EFT transfer"?
12     A.    It says "Please send EFT today."
13     Q.    Right.  Do you understand "EFT" to
14 be electronic funds transfer?
15     A.    Yes, I do.
16     Q.    Were you responsible for any of the
17 electronic funds transfers?
18     A.    Larry did all of those.
19     Q.    And that would be payment from Bath
20 Kitchen Decor or affiliated company to a
21 distributor?
22     A.    Generally.
23         (Exhibit 16, document Bates stamped
24     BKD005867 through BKD005868, marked for
25     Identification.)

Page 71

1     Q.    Mr. Tropper, let me hand you what's
2 been marked as Exhibit number 16 and it's also
3 identified as BKD 5867 and if you look at the
4 second e-mail that's listed on the first page
5 of Exhibit Number 16, are you copied on that
6 particular e-mail?
7     A.    Yes, I am.
8     Q.    And is that pertaining to money
9 that is being paid to or from Circle Lighting
10 for BKD?
11     A.    That's what it says.  It says "Your
12 payment has been applied."
13     Q.    And was there any type of
14 understanding or arrangement with Larry that if
15 there was a certain amount of money, over a
16 certain amount of money or for certain vendors,
17 that you be copied on the e-mail?
18     A.    Nope.
19         (Exhibit 17, document Bates stamped
20     BKD005897, marked for Identification.)
21     Q.    Mr. Tropper, let me hand you
22 Exhibit 17, BKD 5897.  Could you look at the
23 last line, please, in Exhibit Number 17.  I'm
24 asking to ask you what is a Sunday statement?
25     A.    I have no idea.

Page 72

1     Q.    As opposed to a Saturday or Monday
2 statement?
3     A.    I have no idea what it means.
4     Q.    Was there any particular terms you
5 used for any statements or type of accounting
6 on particular days?  Would you do a weekly wrap
7 up on finances at all?
8     A.    Nope.  I never saw that phrase
9 before.
10     Q.    I've been through this entire stack
11 of documents which are approximately maybe four
12 or five hundred pages and what I've looked for
13 before is I don't find one responsive e-mail
14 from you from you at all.  I do find e-mails
15 from Larry to you copying you, CC'g, but I
16 don't see a responsive e-mail.
17         Do you have responsive e-mails to
18 Larry pertaining to BKD, Eagles Lighting or
19 Designers Supply House?
20     A.    I can't say that I remember any for
21 the past whatever number of years if I ever
22 have sent him an e-mail, but the reason why you
23 don't see any is because, like I said, he would
24 just CC me on e-mails on a whim.  There was no
25 response required from me or he wasn't looking

Page 73

1 for anything from me.
2     Q.    Certainly you did speak to him by
3 telephone orally or in person, you would talk
4 to Mr. Krayzman about BKD, Eagles Lighting or
5 Designer Supply House's business?
6     A.    That's true.
7     Q.    Directed to the various defendants
8 in this case, have you, yourself, ever looked
9 at your personal e-mails or even your phone to
10 determine that there are, in fact, responsive
11 documents pertaining to your e-mail
12 communications responsive to Larry pertaining
13 to any of the requested items we have?
14     A.    I apologize.  I don't understand
15 the question.
16     Q.    We have many e-mails from Larry to
17 you.
18     A.    Okay.
19     Q.    We also have requests for
20 production which are document requests to you,
21 to Larry and to BKD where we've asked for
22 communications back and forth pertaining to
23 various subject areas.
24         Have you, with your counsel, looked
25 at your computer for e-mails that you had

19 (Pages 70 to 73)

ORAL DEPOSITION OF DAVID TROPPER

Page 74

1  previously sent or responded to Larry?
2      A.   To the best of my knowledge,
3  whatever my counsel asked me to get, I got.
4      Q.   And that's what I'm saying, as you
5  sit here today, did you look on your notebook
6  computer, desktop computer into whatever your
7  e-mail accounts are and look for any e-mails to
8  Larry?
9      A.   Any documents that my counsel asked
10 me to produce, to the best of my knowledge we
11 produced everything as well as we can.
12     Q.   All right.  What I'm representing
13 to you is I don't find any -- not one e-mail
14 and I'm not being facetious here you certainly
15 know how to use electronic mail; right?
16     A.   Yes.
17     Q.   And you sent those for a period of
18 years?
19     A.   I know how to use e-mail, yes.
20     Q.   What I find curious is I find no
21 e-mails from you to Larry, only one way.  So
22 I'm trying to find out is did you, yourself, go
23 to your Google account, your Gmail account
24 whatever account you had, and look for e-mails
25 back to Larry regarding the business of BKD?

Page 75

1      A.   Right.  Again, what I remember
2  doing was anything that my lawyer asked me to
3  do I did.
4      Q.   And I'm not going to ask what your
5  counsel asked you.  I'm just saying, do you
6  recall as you sit here today do you recall as
7  you sit here today, whether or not you looked
8  for responsive e-mails to Mr. Krayzman?
9      A.   I don't recall specifically doing
10 that.
11     Q.   + What I ask you to do is -- and I
12 can send a follow-up letter to verify that
13 pertaining to our various requests is that
14 would you still -- if you retained those, I'd
15 ask you to produce those to counsel.
16         MR. ZELMAN:  Okay.  Obviously we'll
17 follow-up all requests in writing.
18     A.   Again, whatever he asks me to find,
19 I'll find.
20     Q.   I appreciate that.
21         (Exhibit 18, document Bates stamped
22 BKD005978, marked for Identification.)
23     Q.   Mr. Tropper, I'm going to hand you
24 what was marked as Exhibit 18, also BKD 5978.
25 I'd like to ask you a question about that.

Page 76

1      You note on the e-mail, and I'll
2  give you a chance to read it, where it says
3  "Let's do this," do you have any recollection
4  of what "let's do this" refers to?
5      A.   No recollection at all.
6      Q.   What is the date for that
7  particular e-mail?
8      A.   It says December 9, 2013.
9      Q.   And, again, just to confirm on
10 Exhibit Number 18, are you copied on that
11 particular e-mail, "Let's do this"?
12     A.   It looks like it was sent to me,
13 not as a copy.
14     Q.   But as you sit here today you don't
15 have any recollection of what Mr. Krayzman
16 would be talking about?
17     A.   Nope.
18         (Exhibit 19, document Bates stamped
19 BKD006002 through BKD006006, marked for
20 Identification.)
21     Q.   Let me hand you Exhibit 19 to your
22 deposition, also marked BKD 6002 through 6006.
23 Mr. Tropper, on the first page of Exhibit
24 Number 19, is there an e-mail from Mr. Krayzman
25 to yourself?

Page 77

1      A.   There -- yes, there is.
2      Q.   And is there a header that is shown
3  for Exhibit Number 19?
4      A.   "Minka Aire and Kichler order
5  attached.  Please process ASAP."
6      Q.   Yes.  And, again, when Mr. Krayzman
7  would order from BKD, would it be his custom to
8  copy you on various e-mails to let you know
9  that there had been orders made?
10     A.   I would say that there's no rhyme
11 or reason to when I would or wouldn't be CC'd.
12     Q.   And as far as the header that you
13 just read, is it specifically referring to
14 Minka products?
15     A.   It contacts Minka Aire and Kichler
16 order attached.
17     Q.   Was there any understanding with
18 Mr. Krayzman that if an order was worth a
19 certain amount of money that he would speak to
20 you first?
21     A.   Nope.
22     Q.   Did you have any understanding that
23 pertaining to the credit line that you had
24 taken out that you were trying to only draw a
25 certain amount on the credit line on a monthly

ORAL DEPOSITION OF DAVID TROPPER

Page 78

1    basis or annual basis?
2        A.   No.
3        Q.   Did you ever go back yourself to
4    the financial institution, American Express,
5    and ask for more money?
6        A.   The loans were set up as a one-time
7    thing, so there was no --
8        Q.   Well, many times when someone gets
9    a loan, they go back and ask for a larger loan
10   or to change the terms of the loan.  Do you
11   know if that was done?
12       A.   No.
13       Q.   You didn't do that yourself?
14       A.   No, it wasn't done.
15       Q.   Do you know who Barbara Kaiser is?
16       A.   I never heard the name.
17       Q.   How about Peter Deasy?
18       A.   I've heard the name, but I don't
19   know who he is.
20       Q.   Actually did you meet Mr. Deasy
21   yesterday?
22       A.   Oh, that's Peter that we met on --
23   yeah, now I know who he is.
24            (Exhibit 20, document Bates stamped
25       BKD006060 through BKD006065, marked for

Page 79

1            Identification.)
2        Q.   Let me hand you Exhibit Number 20,
3    also marked as BKD 6060 through 6065.  And on
4    the first page of Exhibit Number 20,
5    Mr. Tropper, are you copied -- not copied
6    actually sent this particular e-mail from
7    Mr. Krayzman?
8        A.   Yup.
9        Q.   What is the date of that e-mail?
10       A.   April 17, 2013.
11       Q.   Again, I'm not going to hold you to
12   a particular month, but do you recall that
13   would certainly be well before the lawsuit that
14   was filed by Minka?
15       A.   Again, if you're saying that it is,
16   I just don't know the date that that was filed.
17       Q.   And do you see where that
18   particular document or through 6065 where it
19   specifically mentions U MR P?  What I'm
20   searching for, Mr. Tropper, and this is on
21   Exhibit Number 20, Bates stamped BKD 6062.  Do
22   you see where it mentions UMRP?
23       A.   Yes.
24       Q.   Do you recall that particular
25   transmittal at all from Mr. Krayzman?

Page 80

1        A.   Nope.
2        Q.   Do you recall at any point in time
3    where Mr. Krayzman forwarded to you a letter
4    from Ms. Kaiser with Minka signed by Mr. Deasy
5    pertaining to their notice to BKD to stop
6    approaching Minka distributors?
7        A.   I don't recall it.  It may have
8    happened, but I don't recall it.
9        Q.   As you sit here, are you denying
10   that there was ever a presuit letter that you
11   had an opportunity to read prior to the lawsuit
12   where Minka said we want you to stop contacting
13   our distributors and asking them to violate
14   their UMRP policy?
15       A.   I'm not denying it.  I don't
16   recall.
17       Q.   As you sit here today, do you
18   recall reviewing a letter either sent from
19   Minka pertaining to BKD's contact with their
20   distributors or a letter from my law firm
21   pertaining to BKD's contact?
22            MR. ZELMAN:  Objection.  The
23   question has been asked and answered
24   twice already.
25       A.   I don't recall -- again, I'm not

Page 81

1    saying that it wasn't sent or Larry didn't
2    somewhere e-mail it to me or forward it to me
3    or tell me, but I don't recall.
4        Q.   But you'd agree with me that what
5    we see in Exhibit Number 20, is that is an
6    accurate e-mail address for you?
7        A.   Yeah, sure.  We've been through
8    that numerous times.
9        Q.   Were you aware that the products
10   that were obtained from the Minka distributors
11   had the distributor's label removed prior to
12   receipt by Bath Kitchen Decor?
13       A.   I was not aware of any labels being
14   removed prior to receipt of Bath Kitchen Decor.
15       Q.   Was there ever a discussion that
16   you had with Mr. Krayzman that BKD had to
17   either remove or ask to have removed the
18   distributor's label as when they originally
19   received the product to protect the distributor
20   from being disclosed to the manufacturer?
21       A.   Could you repeat the question
22   again?
23       Q.   Do you know of any reason why a
24   label -- that when the label was from the
25   manufacturer to the distributor, why that

Innovative Legal Solutions, Inc.,713-658-0802,713-658-0704

ORAL DEPOSITION OF DAVID TROPPER

Page 82

1  particular label would be removed prior to or
2  after you received the product to BKD?
3      A.   Do I know a reason why they would
4  be removed?
5      Q.   Yes.
6      A.   I would assume that Larry was
7  removing them in order to -- that the customer
8  should think that they were buying directly
9  from us as opposed to buying from a third
10  party.
11      Q.   Was there ever any discussion that
12  the reason that the labels were removed to
13  protect the identity of the distributor from
14  getting in trouble with the manufacturer?
15      A.   I don't recall having those
16  conversations with him, but, again, it's -- I
17  can't say for certainty.
18      Q.   Did you have discussions with
19  Mr. Krayzman that you knew that some of these
20  distributors may or may not be terminated by
21  the manufacturer for selling products
22  essentially out the back door?
23      A.   I'm not sure what you mean by
24  "essentially out the back door" but I knew that
25  Larry did tell me at times that he wasn't able

Page 83

1  to buy from certain distributors because they
2  couldn't sell him Minka.
3      Q.   Did he tell you that several of the
4  Minka distributors had been terminated?
5      A.   I don't recall.
6      Q.   Does Larry also go by Leon?
7      A.   No.
8      Q.   Does he have a relative named Leon
9  Krayzman?
10      A.   I think so.
11      Q.   Is that a father or brother?
12      A.   I think it's a brother.
13      Q.   Did he ever work in the business of
14  BKD or any affiliated companies?
15      A.   Yes, he did.
16      Q.   What did Leon do?
17      A.   Customer service.
18      Q.   He'd be working the phones?
19      A.   Yes.
20      Q.   Did you have any family members
21  yourself working there?
22      A.   I had a son come in to schlep some
23  boxes once or twice, but not on a consistent
24  basis.
25      Q.   Strong back?

Page 84

1      A.   Used to.
2      Q.   When was the last time that Leon
3  had any job duties with BKD or any of the
4  affiliated companies?
5      A.   I don't remember exactly.
6      Q.   Do you know if he worked with BKD
7  for a period of months or years?
8      A.   It would probably be months, not
9  years.
10      Q.   Did Leon have any responsibilities
11  for actually starting BKD?
12      A.   Not that I know of.
13      Q.   Do you know what the age difference
14  is between Larry and Leon?
15      A.   No, I don't.
16      Q.   Was Leon a student of yours?
17      A.   No.
18      Q.   Are you aware of any actions that
19  the State of New York has ever taken against
20  BKD or any of its affiliated companies?
21      A.   Actions?
22      Q.   Actions or notices?
23      A.   Not that I'm aware of.
24      Q.   And by that it's some states have
25  what's called a consumer fraud area or words

Page 85

1  associated with the Attorney General's office
2  where if there's business practices that people
3  complain about, sometimes the attorney general
4  or consumer frauds people --
5      A.   Yes, it could be that there were
6  some letters that were received about customer
7  complaints and I would give them to Larry and
8  he would respond to them.
9      Q.   Did you ever participate with Larry
10  on what the particular response would be?
11      A.   No, because it was always customer
12  service related.
13      Q.   You never yourself spoke to
14  somebody with the Attorney General's office or
15  with the Consumer Affairs office with the City
16  of New York?
17      A.   Not that I recollect.
18      Q.   Is there any money that you have
19  advanced yourself to BKD or affiliated
20  companies where any one of those entities owe
21  you money where you can say I put in X dollars
22  into the company and the company still owes me
23  that?
24      A.   Nope.
25      Q.   Have you taken a tax deduction on

Innovative Legal Solutions, Inc.,713-658-0802,713-658-0704

ORAL DEPOSITION OF DAVID TROPPER

Page 86

1 your personal tax returns at all for any
2 activities with BKD or any of the affiliated
3 companies?
4     A.   I would have to -- I don't think
5 so, but I can't say with certainty.  I would
6 have to look back at the tax returns.
7     Q.   What I'm specifically asking about
8 is was there anything with BKD or affiliated
9 companies where you had taken any business loss
10 on a scheduled item?
11    A.   No.
12         MR. ZELMAN:  We have the tax
13    returns for 2011, '12 and '13 and we can
14    make them available if you want to print
15    them and discuss them, we can do that.
16         MR. HAWKINS:  That would be great.
17    We can do that during a break.
18         (Exhibit 21, document Bates stamped
19    BKD006568 through BKD006571, marked for
20    Identification.)
21    Q.   Mr. Tropper, let me hand you
22 Exhibit 21, BKD 6568.  I ask you to look at
23 that and can you confirm whether or not you've
24 been copied on those particular e-mails through
25 6568 through 71?

Page 87

1     A.   Yes, I have.
2     Q.   And are you familiar with a
3 distributor by the name of McNally?
4     A.   I would not say I'm familiar with
5 them, no.  I think I heard the name before, but
6 I'm certainly not familiar with them.
7     Q.   And do you know why you would be
8 copied on those particular e-mails?
9     A.   No idea.
10         (Exhibit 22, document Bates stamped
11    BKD006595, marked for Identification.)
12    Q.   Mr. Tropper, I'm handing you
13 Exhibit 22, BKD 6595.  And you see the e-mail
14 between -- I think it's an e-mail from McNally
15 to Mr. Krayzman?
16    A.   Yup.
17    Q.   Can you read for us what the e-mail
18 text is?
19    A.   "I can't order anything.  My
20 account was suspended.  Just found out."
21    Q.   Was there any question that
22 Mr. Krayzman had with you that McNally's status
23 as a Minka distributor had been cancelled or
24 suspended?
25    A.   I don't recall it.

Page 88

1     Q.   At any point in time, was there
2 anything that you discussed with Mr. Krayzman
3 pertaining to the business practices of BKD,
4 that they should do something different
5 following the termination of distributors or
6 they would chang the manner in which they would
7 procure product?
8     A.   After the lawsuits, I did mention
9 to him and I did tell him that he should not be
10 selling the stuff below IMAP if the
11 manufactures are strict about it.
12    Q.   Is it fair to conclude that that
13 was not accomplished, at least as far as Minka?
14    A.   As far as Minka he certainly did
15 not listen to me.
16    Q.   And there's nothing you did to
17 withdraw from BKD at that point in time?
18    A.   Nope.
19    Q.   Let me hand to you what's
20 previously been marked as Exhibit Number 4 to
21 your deposition.  I represent to you this is a
22 letter sent by my law firm to the attention of
23 Mr. Krayzman.  Do you recall ever reviewing
24 this letter back in the spring or summer of
25 2013 pertaining to a cease and desist notice?

Page 89

1     A.   I don't recall seeing this or
2 reading this.
3     Q.   Did BKD to your knowledge ever have
4 a general liability type of policy, any type of
5 insurance policy?
6     A.   Nope.
7     Q.   Mr. Tropper, what's your current
8 source of income?  With BKD ramping down --
9     A.   Right now I'm financially strapped.
10    Q.   But your wife is employed, your
11 wife has a job?
12    A.   Yes.
13    Q.   But you, as far as yourself, you
14 are not currently employed?
15    A.   Correct.
16    Q.   Other than -- you've got a patent
17 out there and the BKD activities, do you have
18 any other business other than BKD for the last
19 three or four years?
20    A.   Nope.
21    Q.   Has your patent been assigned?
22    A.   Yeah.
23    Q.   Who's it been assigned to?
24    A.   An LLC.
25    Q.   I mean, are you part of the LLC?

23 (Pages 86 to 89)

ORAL DEPOSITION OF DAVID TROPPER

Page 90

1     A.   Yes.
2     Q.   What was the name of it?
3     A.   I don't remember offhand.
4     Q.   But this is dealing with a fire
5  alarm?
6     A.   Smoke detector.
7     Q.   Do you have actually any
8  electronics background yourself?
9     A.   No.
10         (Exhibit 23, copy of 2011 tax
11     return, marked for Identification.)
12     Q.   Mr. Tropper, let me hand to you
13  what's marked as Exhibit Number 23 and first
14  ask you, is that a true and correct copy and
15  complete copy of your 2011 tax return?
16     A.   Yes, it is.
17     Q.   And is that -- sir, is that a joint
18  return for you and your wife?
19     A.   I believe so.  Yup.
20     Q.   As part of your 2011 return, are
21  there any business expenses or deductions?
22     A.   I don't remember offhand.  I would
23  have to look through it.  So -- I'm not very
24  familiar with it, but I think there are some
25  deductions in here.

Page 91

1     Q.   Let me first ask you -- I'm looking
2  at page -- it's page three although it's double
3  sided.  One of the things it lists it says,
4  "The principal business for David Tropper is
5  personal services."
6     A.   Is that a question?
7     Q.   Yes, what are the personal services
8  for David Tropper, in the middle of the page?
9         MR. ZELMAN:  David, did you prepare
10  this document?
11     A.   My accountant prepared it.
12     Q.   If someone was to ask you if your
13  occupation was personal services, Mr. Tropper,
14  what would be those personal services?
15     A.   In 2011 he probably put that down
16  for -- I don't know how he came to that thing.
17  Maybe it was some payments I got for --
18     Q.   As far as first your occupation,
19  have you ever described your occupation as
20  personal services?
21     A.   No.
22     Q.   I'm just trying to figure out what
23  you know from this document.
24         (Exhibit 24, copy of 2012 tax
25     return, marked for Identification.)

Page 92

1     Q.   Let me hand to you what's been
2  marked as Exhibit Number 24, Mr. Tropper.  Is
3  that a true and correct copy of your 2012
4  return?
5     A.   Yes, it is.
6     Q.   If you go to, sir, where I've
7  tagged the yellow highlight there, do you see
8  business expenses there?
9     A.   Yes.
10     Q.   You see there's expenses for, like,
11  a truck?
12     A.   A vehicle.
13     Q.   A vehicle.  What vehicle would that
14  be and for what use?
15     A.   I think it was related to my wife's
16  occupation as a title closer.  She travels a
17  lot.  She travels from --
18     Q.   From closing to closing?
19     A.   Yeah.
20     Q.   It has nothing to do with BKD?
21     A.   No, nothing.
22     Q.   Thank you.
23         (Exhibit 25, copy of 2013 tax
24     return, marked for Identification.)
25     Q.   Mr. Tropper, let me hand to you

Page 93

1  what's being marked as Exhibit 25.  Can you
2  identify that as a true and correct copy of
3  your 2013 tax return?
4     A.   Yes, I can.
5     Q.   Mr. Tropper if you go halfway
6  through Exhibit 25 where the tab is, does your
7  2013 return also reflect income derived from
8  Designers Supply House?
9     A.   Yes, it does.
10     Q.   How much is that?
11     A.   73,356.
12     Q.   And you know that's passive income?
13     A.   It's passed through the LLC.
14     Q.   Passive income.  Were there any
15  debits or deductions?
16     A.   Not that I see unless I'm
17  misreading it, but I'm not an accountant.
18     Q.   Let me see it back.  I can't see
19  it.  Have you undertaken to start your tax
20  returns for 2014 yet?
21     A.   No, sir.
22     Q.   And can you tell me why you would
23  have pass-through income from Designers Supply
24  House LLC but not from Bath Kitchen Decor LLC?
25     A.   Probably because I guess the

Innovative Legal Solutions, Inc.,713-658-0802,713-658-0704

ORAL DEPOSITION OF DAVID TROPPER

Page 94

1    accountant didn't allocate any money coming out
2    of Bath Kitchen Decor towards me as income.
3         Q.   But was there any difference as far
4    as your ownership interest in Designers Supply
5    House LLC as opposed to Bath Kitchen Decor LLC?
6         A.   I don't think so, no.
7         Q.   Would the $73,000, what percentage
8    of the profits would that be?  Would that be
9    100 percent, 50 percent, 25 percent?
10        A.   No, not 100 percent, but I don't
11   remember the exact percentage.
12        Q.   How did you come to that amount?
13   How was it determined?
14        A.   I guess it was just going through
15   records.  It was a much newer entity and had
16   much less going on.
17        Q.   Is it your understanding that BKD
18   has never filed a tax return?
19        A.   Yes.
20        Q.   It's your understanding that
21   Mr. Krayzman has never filed a tax return, at
22   least for the last three or four years?
23        A.   I don't know.
24        Q.   Is there a separate tax return for
25   Designers Supply House, the LLC?

Page 95

1         A.   I don't remember offhand.
2         Q.   Is that something you'd check in to
3    to see if there's a separate tax return?
4         MR. ZELMAN:  Certainly.
5         We'll look into it, I guess.
6         Q.   You understand is that there's
7    pass-through income from Designers Supply House
8    to you; correct?
9         A.   Yeah, whatever is on there.
10        Q.   Right, but you don't know whether
11   or not there's actually a separate tax return
12   filed just for the LLC?
13        A.   I'm not saying there isn't or there
14   is.  I'm saying I don't remember offhand what
15   the accountant did.
16        Q.   Would the same accountant have
17   done --
18        A.   Yes.
19        Q.   If there is one to be filed, he
20   would have been the one to have done it?
21        A.   Yeah.
22        Q.   And is there any reason why you
23   again decided to at this time file a return for
24   Designers Supply House for 2013?
25        MR. ZELMAN:  Well, I don't think he

Page 96

1    said --
2         Q.   Or declare this income as opposed
3    to BKD?
4         A.   It was just trying in the process
5    of getting the books in order and everything,
6    so we started with what was easiest.
7         Q.   Mr. Tropper, I think that's all I
8    have.  Thank you for your time today.
9         MR. ZELMAN:  I have some brief.
10   EXAMINATION BY
11   MR. ZELMAN:
12        Q.   I have a couple of questions about
13   your testimony earlier and then you can go.
14   With regards to all the e-mails we went through
15   between Larry and the various suppliers, what
16   you were CC'd on or what looks like were
17   forwarded to you, how many e-mails do you think
18   you would get from Larry on a typical day if
19   there is an average number?
20        A.   I few.
21        Q.   Is that five, ten maybe?
22        A.   It depends on the -- I would say
23   about maybe five, ten maybe.
24        Q.   You'd get five or ten e-mails a
25   day?

Page 97

1         A.   Maybe.
2         Q.   Would you open all of these
3    e-mails?
4         A.   No.
5         Q.   Would you delete them or mark it
6    read and just move on or what would be your
7    process when you would receive these e-mails?
8         A.   Usually if unless it was something
9    out of the ordinary like him
10   saying you need to read this or something,
11   which was very rare, just, you know, keep it in
12   the marked read column.
13        MR. ZELMAN:  Okay.
14        Q.   You testified you don't remembered
15   seeing those e-mails that you that you were
16   given today?
17        A.   Correct.
18        Q.   As you sit here today do you
19   remember if you did or did not read any of
20   those e-mails at all?
21        A.   I can't say with certainty I never
22   read any, but as a rule I sort of just took it
23   par for the course that I would be CC'd
24   randomly by Larry on stuff.
25        MR. ZELMAN:  Okay.  I have no

25 (Pages 94 to 97)

ORAL DEPOSITION OF DAVID TROPPER

Page 98

1  further questions. I just wanted to
2  bring that out.
3  FURTHER EXAMINATION
4  BY MR. HAWKINS:
5  Q.   Mr. Tropper, you're not denying you
6  didn't receive them; you're saying you, as you
7  sit here today, can't recall what you did or
8  didn't read?
9  A.   If an e-mail has my e-mail address
10  on it, obviously I received it. I do have
11  access to my e-mail. I'm not saying that it
12  wasn't received.
13  Q.   And also when I talked to you
14  earlier in the deposition, you as you recall
15  right here, tried to respond to your counsel's
16  inquiries pertaining to producing documents,
17  but you don't recall right now whether or not
18  you've gone and looked for in your particular
19  in box or sent box to determine which e-mails
20  you responded to over the last two or three
21  years with Larry or regarding those various
22  entities?
23  A.   Not unless it was specifically
24  asked of me.
25  Q.   What I'd ask you to do for us is

Page 99

1  not to, if you have an auto delete function in
2  place I'd ask you to stop that now so counsel
3  and I can follow up with Mr. Zelman to say to
4  the extent you've responded to these e-mails,
5  if there was a response I'd like to see those.
6  A.   No problem.
7  MR. HAWKINS: Mr. Tropper, you as a
8  witness have the right to read and sign
9  the deposition to confirm the accuracy of
10  what you've testified to.
11  Certainly, and to the extent you
12  can make changes, it's not a take-home
13  examination, but to the extent you said
14  blue you meant red, you said a year you
15  meant another year. There's quite a bit
16  of latitude for you to have an
17  opportunity to make those things to make
18  sure you have as accurate a testimony as
19  you want.
20  Would you like an opportunity to
21  read your deposition?
22  THE WITNESS: Yes, I would like an
23  opportunity.
24  MR. HAWKINS: And the court
25  reporter, unless there's a request to get

Page 100

1  an accelerated copy, you'll be able to
2  see it in a week or two weeks and you'll
3  have a certain amount of days in the
4  federal rules, which I think is 30. to
5  read and review those.
6  MR. ZELMAN: I thought it was 60.
7  MR. HAWKINS: Thirty.
8  MR. ZELMAN: In New York State
9  Court it's 60, but I guess it's probably
10  the federal rule applied.
11  MR. HAWKINS: Thank you for your
12  time.
13  (Time noted: 12:51 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 101

1  A C K N O W L E D G M E N T
2
3  STATE OF        )
4                  ) ss.:
5  COUNTY OF       )
6
7  I, DAVID TROPPER, hereby
8  certify that I have read the transcript of my
9  testimony taken under oath in my deposition;
10  that the transcript is a true, complete and
11  correct record of my testimony, and that the
12  answers on the record as given by me are true
13  and correct.
14
15
16                        DAVID TROPPER
17
18  Signed and subscribed to before
19  me, this 23 day of December    , 2014.
20
21
22  Notary Public, State of
       YITZCHAK ZELMAN
23  NOTARY PUBLIC-STATE OF NEW YORK
       No. 012E6313015
24  Qualified in Rockland County
25  My Commission Expires October 14, 2015

26 (Pages 98 to 101)

Innovative Legal Solutions, Inc., 713-658-0802, 713-658-0704

```
 1                C E R T I F I C A T E

 2

 3   STATE OF NEW YORK    )

 4                        )ss.:

 5   COUNTY OF NEW YORK   )

 6

 7           I, SOPHIE NOLAN, a Notary Public

 8   within and for the State of New York, do

 9   hereby certify:

10           That DAVID TROPPER, the witness

11   whose deposition is herein before set forth,

12   was duly sworn by me and that such deposition

13   is a true record of the testimony given by

14   such witness.

15           I further certify that I am not

16   related to any of the parties to this action

17   by blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19           IN WITNESS WHEREOF, I have hereunto

20   set my hand this 12th day of December, 2014.

21

22

23   _____

24   SOPHIE NOLAN

25
```